******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
TRAJUAN A. WASHINGTON
(AC 40031)

Lavine, Sheldon and Bright, Js.

*Syllabus*

Convicted of the crimes of conspiracy to commit home invasion, attempt
to commit home invasion, attempt to commit robbery in the first degree,
conspiracy to commit robbery in the first degree and attempt to commit
assault in the first degree, the defendant appealed to this court. The
defendant's conviction stemmed from an incident in which the defendant
and two coconspirators, including D, allegedly planned to break into
an apartment to steal a large sum of money from a person who lived
there. After arriving at the location, the defendant entered the apartment
building with his coconspirators, knocked on an interior door of a first
floor apartment, and identified himself to an occupant of the apartment
by the name of a person with whom he believed the occupant was
familiar. After the occupant of the apartment began to open the door,
she quickly closed it when she saw three men in hoodies. The defendant
attempted to catch the door before the occupant closed it shut but was
unsuccessful. The defendant and his coconspirators then exited the
apartment building, but while walking away down the street, were fol-
lowed by a man who had exited the apartment building after them.
Believing that the man was armed, the defendant and D fired shots from
their handguns in the direction of the building before fleeing the location.
Several weeks later, the police identified D as one of the shooters, who
in turn identified the defendant as the other shooter. D, who had agreed
to cooperate with the state, testified at the defendant's trial. *Held*:

1. The defendant's claim that the evidence was insufficient to support his
   conviction of conspiracy to commit home invasion was unavailing; the
   jury reasonably could have found that the defendant had agreed with
   his coconspirators to engage in conduct constituting home invasion in
   light of D's testimony that they had intended to break into the apartment
   to steal a large sum of money from the occupant, that they had travelled
   to the apartment together for that purpose, and that the defendant and
   D were armed with loaded handguns that they had purchased together,
   and the jury was entitled to credit and rely on D's testimony as a basis
   for conviction, even if it was the only evidence offered to establish one
   or more essential elements of the charged offense, and even though D
   had been offered and accepted a favorable plea bargain in exchange
   for his incriminating testimony.

2. The evidence was sufficient to support the defendant's conviction of
   attempt to commit home invasion, as the jury reasonably could have
   found that the defendant intentionally took a substantial step in a course
   of conduct planned to culminate in the crime of home invasion; the
   evidence presented at trial, including D's testimony, concerning the
   defendant's conduct in going to the apartment, armed with a loaded
   handgun, with the intent to break into the apartment and steal a large
   sum of money strongly corroborated his criminal purpose, especially
   given that he had misidentified himself to the occupant of the apartment
   in an attempt to cause the occupant of the apartment to open the door,
   and attempted to force his way into the apartment when the door began
   to open, which strongly corroborated his intent to enter an occupied
   dwelling, without the permission of its owner or occupant, with the
   intent to commit a crime therein, while he was armed with a deadly
   weapon.

3. The defendant could not prevail on his unpreserved claim that the trial
   court improperly instructed the jury on the common essential element
   of conspiracy to commit home invasion and attempt to commit home
   invasion by substituting the term "dwelling" with the word "building"
   in its final oral jury instructions, as it was not reasonably possible
   that the instructions, when viewed as a whole, misled the jury and the
   defendant, thus, failed to demonstrate the existence of a constitutional
   violation that deprived him of a fair trial pursuant to the third prong of

the test set forth in *State* v. *Golding* (231 Conn. 233): although the trial court erred by misspeaking during its oral instructions and substituting the word "building" for the term "dwelling" on eight of twenty occasions, the jury had before it the written instructions which clearly, and in a manner sufficiently correct in law, communicated that the defendant must have conspired to unlawfully enter, or intentionally taken a substantial step in a course of conduct planned to culminate in the unlawful entry of, a dwelling, and not merely a building, under circumstances constituting home invasion, to be guilty of conspiracy or attempt to commit home invasion, and neither defense counsel nor the prosecutor objected to or recognized the discrepancy between the written and oral instructions, which suggested that the misstatements were not noticeable to the court, counsel or the jury; moreover, it was not reasonably possible, in the context of this case, that the jury could have been misled to believe that to convict the defendant of conspiracy to commit home invasion and attempt to commit home invasion, it needed only to find that he had agreed to enter and attempted to enter the common spaces of the apartment building in which the intended victims dwelled, and the defendant was not entitled to a reversal of the judgment pursuant to the plain error doctrine, as his claim of instructional error was not so extraordinary that it necessitated reversal of the judgment.

Argued September 7—officially released November 20, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of attempt to commit home invasion, conspiracy to commit home invasion, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, attempt to commit assault in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford, where the defendant elected a trial to the court on the charge of criminal possession of a firearm; thereafter, the remaining charges were tried to the jury before *Dewey, J.*; verdict of guilty; subsequently, the court dismissed the charge of conspiracy to commit robbery in the first degree; judgment of guilty of attempt to commit home invasion, conspiracy to commit home invasion, attempt to commit robbery in the first degree and attempt to commit assault in the first degree; thereafter, the state entered a nolle prosequi as to the charge of criminal possession of a firearm, and the defendant appealed to this court. *Affirmed.*

*Joseph A. Jaumann*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anthony Bochicchio*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Trajuan A. Washington, appeals from the judgment of conviction that was rendered against him, upon the verdict of a jury in the Hartford Superior Court, on charges of conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 and 53a-100aa (a) (2) and attempt to commit home invasion in violation of General Statutes §§ 53a-49 (a) (2) and 53a-100aa (a) (2).[1] The defendant was tried under an amended information dated May 2, 2016, in which the state alleged, in relevant part, that on February 19, 2014 (1) he conspired to commit home invasion by agreeing with one or more persons to enter a dwelling at 33 Seyms Street in Hartford with the intent to commit a crime therein, while he was armed with a deadly weapon and another person not participating in the crime was actually present inside the dwelling, and (2) he attempted to commit home invasion by intentionally taking a substantial step in a course of conduct planned to culminate in the commission of home invasion, while acting with the mental state required for the commission of that offense.[2] On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction of conspiracy to commit home invasion and attempt to commit home invasion, and (2) the trial court erred in instructing the jury on a common essential element of conspiracy to commit home invasion and attempt to commit home invasion by repeatedly substituting the word building for the term dwelling in its final instructions describing those offenses. We affirm the judgment of the trial court.

The jury was presented with the following evidence upon which to base its verdict. On February 19, 2014, at approximately 8:33 a.m., officers of the Hartford Police Department were dispatched to 33 Seyms Street in Hartford to investigate a report of shots fired at that location. Officer Dwayne Tine, a patrolman, was the first officer to arrive at the scene. Upon his arrival, Tine secured the area and performed a preliminary investigation, during which he spoke with Tiffany and Julianna Moore, two sisters who lived on the first floor of the three story apartment building at that address.

Sergeant Jason Lee, a detective with the crime scene division of the Hartford Police Department, arrived at the scene shortly thereafter. Upon his arrival, he searched the area and made two sets of findings of possible relevance to the shooting. First, he found two spent cartridge casings on the sidewalk in front of 39 Seyms Street, the building immediately to the west of 33 Seyms Street. Second, upon inspecting the front of the building at 33 Seyms Street, he found a bullet hole in the center of the front door, a "defect" that could have been caused by a bullet to the left of the number placard immediately to the right of the front door, and jacketing from a bullet in a hole between the brick

wall and the wooden frame of the first floor apartment window to the left of the front door.

Detective Mark Rostkowski of the Hartford Police Shooting Task Force also responded to the report of shots fired at 33 Seyms Street on the morning of February 19. While in the area, he recovered a surveillance video of the shooting that had been recorded by a camera installed on the adjacent building at 39 Seyms Street. A portion of the video, bearing a time stamp of 8:26 a.m., showed three men wearing hoodies walking down the sidewalk toward 39 Seyms Street from the direction of 33 Seyms Street when two of the men, apparently reacting to something off camera behind them, suddenly turned in that direction, raised handguns they had been carrying, and fired shots before running away further to the west. At the conclusion of their investigation on February 19, the police had no leads as to possible suspects in connection with the shooting.

Police investigators got their first lead as to who might have perpetrated the shooting when, several weeks later, they received a tip from Jhllah Govan, who claimed to have witnessed the shooting through the window of the first floor apartment at 33 Seyms Street, where he was then living with his girlfriend, Julianna Moore, and her sister, Tiffany Moore. Govan reported that he had gone to the window that morning after hearing the apartment's front door slam and Tiffany cry out for help. When he did so, he reportedly saw three men walking away from the apartment building to his left when two of the men suddenly turned back toward the building and fired handguns in his direction. Govan identified one of the shooters as a man he had come to know as "Awack," with whom he had been incarcerated at the Hartford Correctional Center sometime after the shooting following his arrest on unrelated charges. Detective Rostkowski subsequently determined that Awack was an alias used by Shannon Davis of Hartford. Accordingly, police investigators showed Govan a photographic array that included Davis' photo, from which Govan identified Davis as one of the men who had fired shots toward 33 Seyms Street on the morning of February 19.

When Rostkowski located Davis, he agreed to speak to detectives about the incident. In his meeting with detectives, Davis confessed to his involvement in the incident and identified the defendant as the other man who had fired shots toward the apartment building at 33 Seyms Street during the course of that incident. Davis was later arrested in connection with the incident and agreed to cooperate with the state.[3]

At the defendant's trial, Davis testified that he, the defendant and a third man he identified only as "Dough" went together to the apartment building at 33 Seyms Street on the morning of February 19, with the intent to break into the apartment of a man named "300" and

steal a large sum of money from him. The defendant and Davis were both armed with handguns, which they had purchased together approximately one week before the incident. After driving together to 33 Seyms Street in Davis' car, the three men entered the front door of the building and walked to the door of a first floor apartment through an interior hallway. The defendant knocked on the apartment door, which had no peep hole in it, and identified himself to the apartment's occupants by the name of a person with whom he believed they were familiar. A female resident of the apartment answered the door and started to open it. When, however, she saw the three men standing before her wearing hoodies, she quickly closed the door. Although the defendant tried to catch the door before the woman could close it, she was able to slam it shut. The three men then left the apartment building and began to walk away to their left, in a westerly direction down Seyms Street, when two women in the first floor apartment began to taunt them from the apartment's front window. Shortly thereafter, an unidentified man came out the front door of the apartment building. Believing that the unidentified man was carrying a weapon, Davis and the defendant turned toward him and fired shots at him with their handguns. No one was injured by the shots. Davis identified himself and the defendant in the video recording of the shooting that Detective Rostkowski had obtained from 39 Seyms Street as the two men who fired handguns in the direction of 33 Seyms Street before running away.

After concluding its deliberations, the jury returned a guilty verdict on all charges, including conspiracy to commit home invasion, attempt to commit home invasion, conspiracy to commit robbery in the first degree, attempt to commit robbery in the first degree, and attempt to commit assault in the first degree.[4] The defendant was later sentenced on those charges to a total effective term of forty years of incarceration, execution suspended after thirty years, and five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

CLAIMS OF EVIDENTIARY INSUFFICIENCY

The defendant first claims that the evidence was insufficient to support his conviction of conspiracy to commit home invasion and attempt to commit home invasion. Specifically, he contends that evidence that he and his companions drove together to 33 Seyms Street while armed with loaded handguns with the intent to break in and steal money, that they attempted to gain entry to the apartment by tricking the residents to believe they were persons known to them, and that he tried to catch the door when the resident attempted to shut it, did not establish that he ever agreed with his companions to commit home invasion or that he

intentionally took a substantial step in a course of conduct planned to culminate in the commission of that offense. For the following reasons, we disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two part test. First we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014). In applying that test, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 594, 72 A.3d 379 (2013).

## A

### Conspiracy to Commit Home Invasion

"A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." General Statutes § 53a-48 (a). "In proving the requisite element of agreement, [i]t is not necessary to establish that the defendant and his coconspirators signed papers, shook hands or uttered the words we have an agreement . . . . Indeed, [b]ecause of the secret nature of conspiracies, a conviction is usually based on circumstantial evidence. . . . [A] conspiracy can be inferred from the conduct of the accused." (Internal quotation marks omitted.) *State* v. *Rosado*, 134 Conn. App. 505, 511, 39 A.3d 1156, cert. denied, 305 Conn. 905, 44 A.3d 181 (2012). "[P]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005).

General Statutes § 53a-100aa provides, in relevant part: "(a) A person is guilty of home invasion when such person enters . . . unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense . . . (2) such person is armed with . . . a deadly weapon . . . ." As used in that statute, the term " 'dwelling' means a building which is usually occupied by a person lodging therein at night, whether or not a

person is actually present . . . ." General Statutes § 53a-100 (a) (2). The term " '[d]eadly weapon' means any weapon, whether loaded or unloaded, from which a shot may be discharged . . . ." General Statutes § 53a-3 (6). The term "enters [a dwelling] . . . unlawfully" means enters a dwelling "not open to the public and when the actor is not otherwise licensed or privilege to do so." General Statutes § 53a-100 (b).

Reading the conspiracy and home invasion statutes together, in light of the foregoing definitions, the essential elements of conspiracy to commit home invasion are as follows: (1) the defendant agreed with one or more other persons to commit home invasion, to wit, to enter a dwelling without license or privilege to do so, with the intent to commit a crime therein, while he was armed with a weapon from which a shot could be discharged, and a person other than one of his coconspirators actually was present in the dwelling; (2) the defendant specifically intended to engage in conduct constituting the crime of home invasion, as previously defined; and (3) at least one of the coconspirators committed an overt act in pursuance of that conspiratorial agreement.

The defendant first argues that the state's evidence was insufficient to convict him of conspiracy to commit home invasion because such evidence came principally from Shannon Davis, one of his alleged coconspirators, who had been offered a favorable plea bargain in exchange for his incriminating testimony. It is well established, however, that "[t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *McClam*, 44 Conn. App. 198, 208, 689 A.2d 475, cert. denied, 240 Conn. 912, 690 A.2d 400 (1997). Accordingly, the jury was entitled to credit Davis' testimony and to rely on it as a basis for conviction even if it was the only evidence offered to establish one or more essential elements of the charged offense. Therefore, we reject the defendant's initial challenge to the sufficiency of the evidence to support his conspiracy conviction.

The defendant next claims that the state presented insufficient evidence to establish that he and his companions entered into an agreement to commit *any* crime, much less the specific crime of home invasion, as required to convict him of conspiracy to commit that offense. On the basis of the testimony of Davis concerning how he, the defendant and Dough planned their visit to 33 Seyms Street on the morning of February 19, however, and their joint efforts thereafter to carry out that very plan, we disagree.

According to Davis, the men's shared purpose in

going to 33 Seyms Street that morning was to break into 300's apartment and take a large sum of money from him. All three men travelled together to 33 Seyms Street that morning for that purpose, supporting the inference that they did so intentionally, pursuant to a joint agreement among them. They did so, moreover, while two of the men, the defendant and Davis, were armed with loaded, operable handguns that they had purchased together approximately one week earlier. This evidence, if believed, certainly was sufficient to establish not only that the three men agreed to engage in a joint criminal enterprise on the morning of February 19, but that they did so with the shared intent to enter an occupied dwelling at that address, without the owner's or occupant's permission, with the intent to commit a larceny within that dwelling, at gunpoint if necessary, while the defendant was armed with a deadly weapon from which a shot could be discharged. The jury reasonably could have relied upon such evidence, viewed in the light most favorable to the state, to find that the specific crime that the defendant and his companions agreed to commit that morning was home invasion in violation of § 53a-100aa. Accordingly, we also reject the defendant's remaining challenges to the sufficiency of the evidence to support his conspiracy to commit home invasion conviction.

B

Attempt to Commit Home Invasion

The defendant next challenges the sufficiency of the state's evidence to support his conviction of attempt to commit home invasion. The defendant claims, more particularly, that because "no entry was ever made" into the first floor apartment at 33 Seyms Street, the state failed to establish that he intended to commit home invasion, or intentionally took a substantial step in a course of conduct planned to culminate in the commission of that offense, as opposed to some other crime. We disagree.

General Statutes § 53a-49 (a) (2) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." "To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose. . . . This standard focuses on what the actor has already done and not what remains to be done. . . . The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime." (Internal quotation marks omitted.) *State* v. *Andrews*, 114 Conn. App. 738, 747, 971 A.2d 63, cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009).

General Statutes § 53a-49 (b) provides in relevant part: "Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law . . . (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed . . . [and] (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances . . . ." In *State* v. *Serrano*, 91 Conn. App. 227, 242–43, 880 A.2d 183, cert. denied, 276 Conn. 908, 884 A.2d 1029 (2005), this court held that the evidence was sufficient to support a conviction of attempt to commit burglary where the victim "was in her apartment at the relevant time when she saw a fork being inserted past the door lock striker and saw the doorknob turn. When the door opened, she saw the defendant holding a fork near the locking mechanism. The defendant stated that he was at the wrong apartment, covered his face and ran down the stairs. It was reasonable for the jury to infer that the defendant was attempting to break into the apartment."

Reading the attempt and home invasion statutes together, the essential elements of attempt to commit home invasion are that (1) the defendant intentionally took a substantial step in a course of conduct planned to culminate in his commission of the crime of home invasion, to wit, entering a dwelling without license or privilege to do so, with the intent to commit a crime therein, while he was armed with a weapon from which a shot could be discharged, and another person not participating in the crime was actually present in the dwelling; and (2) at the time he took that substantial step, the defendant was acting with the mental state required for commission of the crime of home invasion, to wit, intent to commit a crime inside of the unlawfully entered dwelling. The evidence presented at trial concerning the defendant's conduct on the morning of February 19, was strongly corroborative of his alleged criminal purpose of committing the crime of home invasion. On the basis of Davis' testimony, which the jury reasonably could have credited and relied upon, the defendant went to 33 Seyms Street on that morning, while he and Davis were armed with loaded weapons from which shots could be discharged, with the intent to break into an apartment at that address and steal a large sum of money from a person who lived there. When he and his companions arrived at that address, moreover, he used a ruse to cause the person who responded to his knock on the apartment door to open that door, then tried to force his way inside when the door began to open. Such evidence reasonably could have been found to strongly corroborate the defendant's intent to enter an occupied dwelling, without the permission of its owner or occupant, with the intent to

commit a crime therein, while he was armed with a deadly weapon. It thus was sufficient to establish that he intentionally took a substantial step in a course of conduct planned to culminate in the commission of a home invasion. Therefore, his claims of evidentiary insufficiency as to his conviction of attempt to commit home invasion must likewise be rejected.

## II

### CLAIMS OF INSTRUCTIONAL ERROR

The defendant next claims that the trial court erred by instructing the jury improperly on a common essential element of conspiracy to commit home invasion and attempt to commit home invasion. Specifically, he contends that the jury could have been misled by the trial court's repeated substitution of the word building for the term dwelling in its final oral jury instructions on the elements of those offenses, thereby diluting the state's burden of proof as to those offenses. The defendant concedes that this claim is unpreserved, and thus he seeks review of the claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). In the alternative, he asks that we reverse his conviction under the plain error doctrine. Although we conclude that the claim is reviewable under the first two prongs of *Golding*, we further conclude that the claim fails under *Golding*'s third prong, as modified by *In re Yasiel R.*, which requires that he demonstrate that "the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." *Golding*, supra, 240. The following additional facts are necessary to our review of this claim.

On May 11, 2016, the day before the jury charge was to be given, the court held a brief charging conference on the record, during which it clarified the language it would use in its instructions on the underlying offense of home invasion, which the defendant was charged, in separate counts, with conspiring and attempting to commit. The court's focus in that conference was on whether it should describe that underlying offense, as the defendant allegedly conspired and attempted to commit it, as "entering or remaining" in the subject premises under circumstances constituting home invasion or merely "entering" those premises under such aggravating circumstances. After the close of testimony later that day, the court distributed to counsel copies of what it called the "close-to-final version" of its jury instructions so that they could take them home and review them. The following day, when counsel were asked to state for the record if they wished to make any changes or corrections to the written instructions, they both answered in the negative.

During the state's closing argument concerning the charge of attempted home invasion, it focused on the

alleged conduct of the defendant and his companions just outside the interior door of the Moore sisters' first floor apartment, contending that "the attempt [was] knocking on the door [of the apartment] and trying to get in . . . ." Notably, defense counsel's closing argument focused solely on the issue of identity, challenging the credibility of the defendant's alleged coconspirator, Davis, who was the only person to implicate the defendant as a participant in the charged offenses. Before giving its oral charge, the court distributed written copies of its final instructions to the jury so that the jurors could read along as the court read the instructions aloud, and so they could have the instructions with them in writing when they conducted their deliberations.

In its written instructions on the charge of home invasion, the court substituted the word building for the term dwelling on two of the twenty occasions when it should have used the term dwelling to describe the elements of the charged offenses. The first such occasion was when the court, in discussing the first element of home invasion, namely, that the defendant unlawfully entered a dwelling, stated: "The inference may be drawn if the circumstances are such that a reasonable person of honest intention, in the situation of the defendant, would have concluded that he knowingly and unlawfully remained in the *building*." (Emphasis added.) The second such occasion occurred when the court, in discussing the fourth element of home invasion, namely, that the defendant was armed with a deadly weapon, stated: "This means that the defendant at some point of entering the *building* had actual physical possession of a deadly weapon." (Emphasis added.) There were no other substitutions of the word building for the term dwelling in the court's written instructions.

When reading its written instructions to the jury, however, the court misspoke on eight of the twenty occasions when it should have used the word dwelling to define the elements of home invasion by using the word building in its stead. The first time the court misspoke in its oral instructions was when it gave the general definition of the term knowingly, stating: "In this case, the inference may be drawn if the circumstances are such that a reasonable person of honest intention, in the situation of the defendant, would have concluded that he unlawfully entered a *building*." (Emphasis added.) The court next substituted the word building for the term dwelling in its recitation of the text of General Statutes § 53a-100aa (a) (2), when it stated: "A person is guilty of home invasion when such person unlawfully enters or remains in a *building* . . . ." (Emphasis added.) The court thereafter used the word building instead of the term dwelling on three more occasions in quick succession, stating: "Element one— it says remained in the *building*. It should be entered a *building*. The first element is that the defendant knowingly and unlawfully entered a *building*." (Emphasis

added.) The court again used the word building instead of the term dwelling when it further explained the first element of home invasion, stating: "The inference may be drawn if the circumstances are such that a reasonable person of honest intention, in the situation of the defendant, would have concluded that he knowingly and unlawfully—it says remained but it should be entered in the *building*." (Emphasis added.) This instance was one of the two substitutions of the word building for the term dwelling that also appeared in the court's written instructions.

The next use of the word building by the court was when it appeared as part of the definition of the term dwelling. The court thereafter continued to use the term dwelling as required by the statute until it reached the fourth and final element of home invasion, as to which it said: "This means that the defendant at some point of entering the *building* had actual physical possession of a deadly weapon." (Emphasis added). This use of the word building for the term dwelling repeated the second such substitution as it appeared in the court's written instructions.

At the conclusion of its oral charge, the court asked counsel if they had any comments or questions about the charge, but neither defense counsel nor the prosecutor took exception to the charge. Thereafter, during the jury's deliberations, it asked no questions about any of the court's written or oral jury instructions.

As an initial matter, the defendant concedes that this claim is unpreserved, and thus seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781.

This unpreserved claim is reviewable under the first two prongs of *Golding* because the oral jury charge and the written instructions are set forth in their entirety in the record and the claim is of constitutional magnitude. See *State* v. *Aponte*, 259 Conn. 512, 518, 790 A.2d 457 (2002) (failure to instruct jury on essential element of crime deprives defendant of constitutional right to have jury told crimes charged and essential elements of those crimes). Therefore, we turn to the third prong of *Golding* to determine whether "the alleged constitu-

tional violation . . . exists and . . . deprived the defendant of a fair trial." *State* v. *Golding*, supra, 213 Conn. 240.

Our analysis under the third prong of *Golding* begins with the "well established standard of review governing claims of instructional impropriety. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 452–53, 988 A.2d 167 (2009). In resolving this claim, we note that "[r]eviewing courts are especially hesitant in reversing a conviction on the basis of an inaccuracy in a trial court's oral instruction if the jury was provided with accurate written instructions." *State* v. *Holley*, 174 Conn. App. 488, 497, 167 A.3d 1000 (2017), cert. denied, 327 Conn. 907, 170 A.3d 3 (2017), cert. denied, U.S. , 138 S. Ct. 1012, 200 L. Ed. 2d 275 (2018).

In the present case, it is conceded by the state that the court erred in substituting the word building for the term dwelling in its instructions describing the crime of home invasion as the alleged object of the defendant's alleged conspiracy and attempt. We conclude, however, that it is not reasonably possible that the jury was misled by such erroneous instructions under the circumstances of this case or that the defendant was thereby deprived of a fair trial. The jury was given copies of the court's written instructions, which properly defined the term dwelling and correctly listed it as an element of home invasion on eighteen of the twenty times when that term should have been used in such written instructions. Such written instructions were available to the jury both during the delivery of the court's oral instructions and throughout its deliberations. Thus, although there were two instances in the written charge where the trial court erroneously used the word building instead of the term dwelling, when considering the whole charge, the other eighteen uses of the term dwelling clearly communicated to the jury that the defendant must have conspired to enter a dwelling, not merely a building, under circumstances constituting home invasion to be guilty of conspiracy to commit home invasion,

and similarly must have intentionally taken a substantial step in a course of conduct planned to culminate in the unlawful entry of a dwelling under such circumstances to be guilty of attempt to commit home invasion. Moreover, neither counsel seemed to recognize that the court had misspoken at the time of trial since neither took exception to the charge. This suggests that, although the challenged misstatements were incorrect, they were not noticeable to the court, counsel, or the jury.

The defendant claims that the jury could have been misled to believe that to convict him of conspiracy to commit home invasion and attempt to commit home invasion, it needed only to find that he had agreed to enter and attempted to enter the common spaces of the apartment building instead of the individual apartment within that building in which the intended victims dwelled. This is not reasonably possible in the context of this case. It was uncontested that the three men entered the front door of the apartment building and approached the door of a first floor apartment within it through a common hallway. It was uncontested throughout the trial that the first floor apartment was indeed a dwelling. It was clear from the testimony presented during trial and the arguments of counsel that the criminal activity at issue was that which occurred at the inner door to the first floor apartment. There was never any suggestion that the perpetrators' unopposed entry to the common area of the apartment building through its front door was the basis of the prosecution in this case. Therefore, although we conclude that the court erred by misspeaking during its oral charge, the overall charge, as delivered orally and in writing, was sufficiently correct in law and adapted to the issues to provide ample guidance to the jury, and, thus, the defendant was not deprived of a fair trial. Accordingly, his claim fails under *Golding*'s third prong

Furthermore, we also conclude that the defendant is not entitled to reversal for plain error pursuant to Practice Book § 60-5. "[P]lain error review is reserved for only the most egregious errors. When an error of such a magnitude exists, it necessitates reversal." *State* v. *McClain*, 324 Conn. 802, 814, 155 A.3d 209 (2017). "[T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." (Internal quotation marks omitted.) *State* v. *Gaffney*, 148 Conn. App. 537, 542, 84 A.3d 1261, cert. denied, 312 Conn. 902, 91 A.3d 907 (2014). For the foregoing reasons, we cannot conclude that the defendant's claim is so extraordinary that it necessitates reversal of the judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also was convicted of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), and attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and § 53a-59 (a) (5). No claim of error has been made on appeal with respect to his conviction of those charges.

[2] The amended information also charged the defendant with criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant elected to try this final count to the court. The state entered a nolle prosequi on this charge on July 21, 2016.

[3] Davis pleaded guilty to his involvement in the incident in exchange for a suspended sentence and probation. As part of the terms of his probation, Davis agreed to continue to cooperate with the Hartford Police Department and the state on this case and others.

[4] The court dismissed count four of the amended information, conspiracy to commit robbery in the first degree, in accordance with our constitutional protections against double jeopardy. "The double jeopardy clause of the fifth amendment to the United States constitution provides that no person shall be subject for the same offense to be twice put in jeopardy of life or limb. This clause prohibits not only multiple trials for the same offense but also multiple punishment for the same offense." (Internal quotation marks omitted.) *State* v. *Brown*, 132 Conn. App. 251, 255, 31 A.3d 434 (2011), cert. denied, 303 Conn. 922, 34 A.3d 396 (2012).