******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* DAQUAN D. WILLIAMS
## (AC 39597)

Alvord, Bright and Bear, Js.

*Syllabus*

Convicted of the crimes of manslaughter in the first degree and attempt to commit home invasion, the defendant appealed to this court, claiming that the evidence was insufficient to support his conviction of attempt to commit home invasion. The defendant's conviction stemmed from an incident in which he and two others, P and J, went to an apartment complex where C resided because J was having a dispute with C over a girl. At least two of the men, dressed in black and wearing ski masks, attempted to enter an apartment where C was located with a baseball bat. Thereafter, a fight ensued outside, during which the defendant repeatedly stabbed C's stepfather, causing his death. The defendant claimed that the evidence was insufficient to show that he attempted to enter the apartment in which C was located and that he had the specific intent to seriously injure C. *Held* that the evidence was insufficient to support the defendant's conviction of attempt to commit home invasion, there having been insufficient evidence to prove beyond a reasonable doubt that the defendant had the specific intent to commit a felony assault upon another individual, C, if the defendant and his cohorts successfully entered the apartment in which C was located: although there was sufficient evidence from which the jury could have concluded that the defendant took a substantial step toward unlawfully entering the apartment, the record was devoid of any evidence that the defendant knew or had any issues with C, that he took any action toward C from which an intent to inflict serious injury could have been inferred, that the defendant removed his knife from his pocket during any attempt to enter the dwelling, or to support an inference that the defendant took any action to indicate that he intended to use a metal bat against C, as the prosecutor at trial argued to the jury that defendant was being used as backup because J wanted to fight C, and did not argue, and the evidence did not establish, that the defendant possessed the specific intent to commit the crime of home invasion as charged by the state; moreover, because the state charged the defendant as a principal and not an accessory, proof that either the defendant or one of his codefendants intended to commit a felony against C would have been legally insufficient to support a judgment of conviction against the defendant, and any suggestion that the jury could have inferred that the defendant had the requisite intent because one of his codefendants was about to assault C was incorrect.

Argued November 14, 2018—officially released January 22, 2019

*Procedural History*

Information charging the defendant with one count of the crime of murder and two counts of the crime of attempt to commit home invasion, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Bentivegna, J.*; verdict and judgment of guilty of the lesser included offense of manslaughter in the first degree and of one count of attempt to commit home invasion, from which the defendant appealed to this court. *Reversed in part; judgment directed in part; further proceedings.*

*Mary A. Beattie*, for the appellant (defendant).

*Linda F. Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, was *Anne F. Mahoney*, state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, DaQuan D. Williams, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit home invasion in violation of General Statutes §§ 53a-49 and 53a-100aa (a) (1).[1] On appeal, the defendant claims that there was insufficient evidence to support this conviction because the state failed to prove that he attempted to enter the apartment in which Jouleigh Clemente was located, and the state failed to present evidence that he had the specific intent to seriously injure Clemente. We reverse the judgment of conviction on this count.

On the basis of the evidence presented, the jury reasonably could have found the following facts. On the evening of February 26, 2013, the defendant was wearing gloves, a black sweatshirt, a blue hoodie, two pairs of gray sweatpants, a blue ski mask and black sneakers. He also was in possession of a black pocket knife. On that cold and rainy winter evening, Kristopher Pryce drove the defendant and Isiah Jones to the Summerfield apartment complex in East Hartford,[2] where Clemente lived in unit 109 with his younger brother, Westley, his mother, Jasmin Fuentes, and his stepfather, Jonathan Lopez.

Jones and Clemente were having a dispute about a girl. On that evening, Clemente was not in unit 109, but, rather, he and his brother were visiting their friend Juan Carlos Zavala in unit 69. Zavala lived in unit 69 with his younger brother, Jack, his mother, Vilma Rodriguez, and his mother's boyfriend, Angel Luis Nieves.

While Rodriguez and Nieves were upstairs in unit 69, they heard Zavala, Jack, Westley, and Clemente downstairs making a commotion and yelling that someone was trying to get into the apartment. When Rodriguez and Nieves looked downstairs, they saw the young males trying to force a metal bat back out of the doorway, while simultaneously trying to close the door. Nieves jumped from the top of the staircase and successfully assisted the young males in pushing the bat out of the doorway, and then locked the door. Rodriguez looked outside from her bedroom window, and she saw two teenaged males, dressed in black, wearing winter masks, and carrying bats. The young males in the apartment told Rodriguez that Clemente and Zavala were having problems with Jones and Pryce. Rodriguez then telephoned 911, telling the dispatcher that two teenaged males from her apartment complex,[3] dressed in black and wearing masks, were hitting her door, trying to break into her apartment, and one of them had a bat. Rodriguez recognized Pryce outside. Nieves, who also looked out the upstairs window, saw people wearing masks on the side of the building.

Clemente then ran out the door, heading toward his apartment, unit 109, with Westley and Zavala chasing

after him. Rodriguez and Nieves chased after them. Rodriguez soon realized that there were three other teenaged males, not two, involved in the incident. One of those males was standing near the side of her apartment, while another, Jones, was fighting with Clemente.

No one interfered in the fight between Jones and Clemente because the fight was a "fair one," with no weapons. As the two fought, the defendant stood next to a red car, near the street, somewhere between unit 69 and unit 109. At some point, however, Lopez, Clemente's stepfather, came outside. Lopez and the defendant exchanged words, and Lopez knocked a bat out of the defendant's hands and pushed him onto the red car. Jasmin Fuentes, Clemente's mother, who also had come outside, picked up the metal bats that were lying on the ground and put them in her apartment.[4] The defendant and Lopez began fighting, and the defendant took out his knife and repeatedly stabbed Lopez, who, thereafter, was able to retreat into his apartment.[5]

The defendant, Jones, and Pryce attempted to flee the scene, but were pulled over by the police before they exited the apartment complex. Pryce was driving, and Jones was in the passenger seat, with the defendant, who was shirtless and covered in blood, in the back seat. The defendant's blue hoodie was on the seat next to him. The three were arrested. The defendant was charged with murder and two counts of attempt to commit home invasion, one under each subdivision of § 53a-100aa (a).[6] The jury found the defendant guilty of the lesser offense of manslaughter in the first degree, as well as attempt to commit home invasion under § 53a-100aa (a) (1). It found him not guilty of attempt to commit home invasion under §53a-100aa (a) (2). The court sentenced the defendant to twenty years to serve on the manslaughter conviction, and to a concurrent mandatory minimum ten-year term on the attempt to commit home invasion conviction, for a total effective sentence of twenty years incarceration. This appeal followed.

On appeal, the defendant claims that there was insufficient evidence to support his conviction of attempt to commit home invasion.[7] He argues that the state failed to prove two elements of this crime: "First, there is insufficient evidence that [the] defendant personally took a substantial step toward unlawfully entering the dwelling at issue. Second, there is insufficient evidence that, at the time of the claimed home invasion attempt, [the] defendant intended to seriously injure Jouleigh Clemente."

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the

cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"An appellate court may not second-guess a jury's credibility determinations. . . . In reviewing the evidence, the reviewing court [is] bound by the jury's credibility determinations and all reasonable inferences the jury could have drawn from the evidence." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Gemmell*, 151 Conn. App. 590, 604–605, 94 A.3d 1253, cert. denied, 314 Conn. 915, 100 A.3d 405 (2014).

When determining whether the state introduced evidence sufficient to support the trial court's judgment of conviction, we look not just at the charging document, but also at the state's theory of the case. "When the state advances a specific theory of the case at trial . . . sufficiency of the evidence principles cannot be applied in a vacuum. Rather, they must be considered in conjunction with an equally important doctrine, namely, that the state cannot change the theory of the case on appeal." (Internal quotation marks omitted.) *State* v. *Carter*, 317 Conn. 845, 853–54, 120 A.3d 1229 (2015). Of particular relevance to this case, where the state's theory rests on an intent to injure a specific person, the question for us is whether there is sufficient evidence that the defendant specifically intended to injure that particular person. Id., 855.

Count two of the long form information accused the defendant "of the crime of criminal attempt to commit home invasion in violation of . . . §§ 53a-49 and 53a-100aa (a) (1) and allege[d] that on or about February 26, 2013, in East Hartford . . . [the defendant] intentionally did an act which, under the circumstances he believed them to be, was an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime of home invasion." The state's theory of the case, as argued before the jury, was that Pryce picked up the defendant and Jones and "drove them to the Summerfield apartments. . . . Jones had been having a beef with . . . Clemente, who lived over at those apartments, over a girl . . . . [Clemente] was trash-talking [Jones] because [Clemente] had basically won [the girl] away from him.

"So, the brains of the operation, Pryce, decided that he would drive them over there. [Jones] decided to bring the heavy, who is this defendant, to come along as a backup. And [Jones] left the house with a metal bat that night. The defendant had his knife on him, and they were all dressed in dark clothing. They went over to the Summerfield apartments because they were going to get [Clemente].

"When they got there . . . all three of them got out [of the car] . . . . The defendant had on his black ski mask, dark clothing, dark gloves, and [Jones] said to him, they ain't coming out. . . . So, they started banging on the door trying to break in, and they didn't stop banging until [Clemente] came out. While the banging was going on inside the home at [unit] 69 . . . the defendant and his friends decided to break into the house. The boys in the house told the mother upstairs, hey, somebody's trying to break in. She came down, saw the bat, all sorts of craziness going on. She went back upstairs to call 911. . . . [T]hey tried to go into the house, and they [were] breaking in with the bats."

"So, they drove over there. They brought baseball bats. They banged on the door. They damaged the door. They managed to get a bat in. And they were going . . . [to enter] the dwelling . . . . I don't have to actually prove it to you that they did enter it, but that this was their intent. They were intending to go in the dwelling. They wanted to commit a crime inside. There were people inside the dwelling who were not participants in the crime. And that once they got inside there, *either he or his codefendants were about to attempt to commit a felony against a person in the home. In other words . . . Clemente.*

"[Jones] wanted to beat [Clemente] up. He wanted to make sure he was the winner of that fight so he brought the bigger and the heavier defendant with him, an armed defendant with him, and they were trying to break in the house to get to [Clemente]." (Emphasis added.)

In this case, the defendant was charged in relevant part with attempt to commit home invasion. Section 53a-100aa (a) provides in relevant part: "A person is guilty of home invasion when such person enters . . . unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense: (1) Acting either alone or with one or more persons, such person or another participant in the crime commits or attempts to commit a felony against the person of another person other than a participant in the crime who is actually present in such dwelling . . . ."

Section 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with

the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law . . . (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed . . . ."

"To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose. . . . This standard focuses on what the actor has already done and not what remains to be done. . . . The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime." (Internal quotation marks omitted.) *State* v. *Washington*, 186 Conn. App. 176, 187–88,     A.3d (2018).

Reading the attempt and home invasion statutes together, the essential elements of attempt to commit home invasion under §§ 53a-49 and 53a-100aa (a) (1) in this case are: (1) the defendant intentionally took a substantial step toward entering unit 69 without license or privilege to do so; (2) the defendant had the specific intent to commit a crime in unit 69; (3) at least one other person not participating in the attempt to enter unit 69 without license or privilege to do so was present in unit 69; and (4) the defendant or another participant in the defendant's attempt to enter unit 69 was going to commit a felony against another person in unit 69, who was not a fellow participant in the crime. See id., 187–89.

The state's theory of the case, in satisfaction of prongs one and three, was that the defendant intentionally took a substantial step toward entering unit 69 without license or privilege to do so, while Rodriguez and her family, along with Clemente and his brother, were present in unit 69; in satisfaction of prong two, the state's theory was that the defendant had the specific intent to commit a crime while in unit 69, to wit, a felony assault against Clemente.[8] The state also argued to the jury, however, in satisfaction of prong four, that the defendant *or another participant* in the defendant's endeavor was going to commit a felony assault against Clemente. Although the state could have sought to prove, in satisfaction of prong two, that the defendant, himself, had intended to commit some other crime in

unit 69, either a felony or a misdemeanor, the state instead sought to prove that the crime the defendant, himself, intended to commit, if successful in his entry into unit 69, was a felony assault against Clemente.

The defendant argues that the evidence presented by the state in this case was insufficient to prove that (1) he, personally, attempted to enter a dwelling, namely unit 69 in the Summerfield apartment complex, in an unlawful manner, and (2) he had the specific intent to commit felony assault against Clemente if successful in his attempt to enter unit 69.

The defendant argues that he "was not charged with conspiracy to enter the dwelling, or as an accessory. He was charged as a principal, and that is how the jury was instructed. Thus, the state needed to prove that [the] defendant, personally, attempted to enter the dwelling." Further, he argues, the state also failed to present any evidence that he had the specific intent to commit felony assault against Clemente if he were successful in entering the apartment. He argues that there was no evidence, direct or circumstantial, that he personally intended to commit felony assault against Clemente and that the state, in fact, even argued during his trial that it was Jones who wanted to fight Clemente and that the defendant merely was there as "backup." (Internal quotation marks omitted.) He contends that the state is relying on nothing more than conjecture.

The state responds that, on the basis of the evidence presented, the jury reasonably could have inferred that Jones, Pryce, and the defendant all had metal bats with them, and that they intended to use them for "unlawful purposes." The state argues that the "jury further could have inferred . . . that the effort to insert a bat into the dwelling was not limited to only one of the three potential intruders. . . . Thus, under a theory of principal liability . . . the jury reasonably could have found that the defendant acted with the intent to unlawfully enter the dwelling and took a substantial step toward doing so." Furthermore, the state argues, "it was undisputed that the defendant was armed with a knife and was dressed in two sets of clothing, a ski mask, and gloves. Three bats were found at the scene. The defendant was still carrying a bat while [Jones] and [Clemente] were fighting. Moreover, the defendant came armed with a knife and, undisputedly, used his knife to stab . . . Lopez . . . Based on the fact that the defendant inflicted a fatal stab wound to the unarmed victim—a man he did not know—during a fistfight, it is a reasonable inference that he brought the knife with him to Summerfield intending to use it on Clemente— an antagonist of his friend [Jones]."[9]

We agree with the state that there was sufficient evidence from which the jury could conclude that the defendant took a substantial step toward unlawfully entering unit 69. Rodriguez testified that it was approxi-

mately 11 p.m., on a cold and rainy night, when Zavala, Jack, Westley, and Clemente, who were in unit 69, started running upstairs, indicating something was going on, so she looked out of her upstairs window and saw "three guys with masks and bats," and she telephoned the police. She thought that one of them may have had a gun.[10] She testified that she told the police that there were three males trying to get into her apartment "because one of them hit [her] door with a bat and then the bat kind of stayed stuck in between the door and that's when [Nieves] came down, pushed the bat out and got the door locked."[11] Rodriguez admitted, however, that when she spoke with the police, via 911, she had told them that there were only two black males trying to get into her apartment. She explained to the jury that she had not realized there was a third male until she went outside and saw him "standing on the side of . . . the building." Rodriguez further acknowledged that she told the police, via her 911 call, that there were two teenaged males, dressed in black, and that she had no doubt in her mind, when she relayed that information to the 911 operator, that was what she was seeing. She also acknowledged at trial that that was what she saw that night when she looked out of her bedroom window. Rodriguez then acknowledged that the young males in her apartment said that they, especially Clemente, were having a problem with Jones and Pryce.

Rodriguez further testified that after Nieves had closed and locked the door, Clemente opened the door and ran toward his apartment; two or three guys, wearing all black, then chased after him. Rodriguez and others followed. Rodriguez stated that Clemente and Jones then began engaging in a fair fight, one with no weapons, and she saw Fuentes gather up the bats and bring them inside her apartment. She also saw the defendant standing next to a car at that time, which was parked approximately halfway between unit 69 and unit 109. Rodriguez stated that Pryce was standing some distance away, closer to her apartment. The defendant was seen by another witness holding a bat at that time, but neither he nor Pryce attempted to interfere in the fight. It also was undisputed that the defendant was in possession of a pocket knife. This, essentially, was the evidence presented by the state in support of the charge of attempt to commit home invasion under § 53a-100aa (a) (1).

Viewing this evidence in a light most favorable to sustaining the verdict, we conclude that the jury reasonably could have inferred that the defendant took a substantial step toward unlawfully entering unit 69. Rodriguez saw at least two teenaged males attempting to enter the unit, and at least one of them had a bat. The defendant, shortly thereafter, standing near a red car, was seen holding a bat while Jones and Clemente were fighting. It is a reasonable conclusion that the

defendant had attempted to gain entry into unit 69 in an unlawful manner.

We further conclude, however, that there simply was no evidence that could have led the jury reasonably to conclude, without resort to conjecture and speculation, that the defendant had the specific intent to commit a felony assault upon Clemente if he and his cohorts successfully entered unit 69. See *State* v. *Josephs*, 328 Conn. 21, 35, 176 A.3d 542 (2018) ("A trier of fact is permitted to make reasonable conclusions by draw[ing] whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . [These inferences, however] cannot be based on possibilities, surmise or conjecture." [Internal quotation marks omitted.]).

In the present case, there was no evidence that the defendant knew or had any issues with Clemente. By contrast, the evidence did demonstrate that Jones and Clemente were having a dispute over a girl. There also was no evidence that the defendant ever took any actions toward Clemente from which an intent to inflict serious injury could have been inferred. To the contrary, when Clemente fled from unit 69 the defendant did not approach him. The uncontroverted evidence at trial was that the defendant was not involved in any way in the altercation between Clemente and Jones.

Furthermore, the state's argument that the jury reasonably could have inferred, from the facts that the defendant had a knife on his person and used it on Lopez, that the defendant intended to use the knife on Clemente if he was successful in breaking into unit 69 is inconsistent with the evidence the jury heard. There is no evidence that the defendant removed the knife from his pocket during any attempt to enter unit 69. There also is no evidence that the defendant removed the knife from his pocket when Clemente fled from unit 69 or when he was near the car while Clemente and Jones fought. The only evidence regarding the defendant's use of the knife is that he removed it from his pocket and stabbed Lopez with it after he and Lopez already were engaged in a physical fight. Contrary to the state's argument, this evidence does not support a reasonable inference that the defendant intended to use the knife to inflict serious injury on Clemente if he successfully had broken into unit 69.[12]

Similarly, there was no basis for the jury reasonably to infer that the defendant intended to use a metal bat to inflict serious physical injury, a felony assault, on Clemente. The state's reliance on the fact that the defendant later was seen holding a bat while Clemente and Jones fought is misplaced because the record is devoid of evidence that would support an inference that the defendant ever took any action to suggest that he intended to use the bat to assault Clemente. Rather, the evidence demonstrates that the defendant did not

attempt to interfere in the fight between Clemente and Jones.

Furthermore, the prosecutor during her closing argument at trial, summarizing the state's theory of the case, did not argue that the evidence proved that the defendant intended to assault Clemente and inflict serious injury on him during the alleged home invasion. Rather, the state argued to the jury that the defendant was brought as backup because Jones wanted to fight Clemente. The prosecutor then went on to argue that "once they got inside [unit 69], *either* [*the defendant*] *or his codefendants were about to commit a felony against a person in the home. In other words . . . Clemente.*" (Emphasis added.)

Because the state charged the defendant as a principal and not an accessory, however, proof that *either* the defendant *or* one of his codefendants intended to commit a felony against Clemente would be legally insufficient to support a judgment of conviction against the defendant, who was charged only as a principal. Similarly, any suggestion that the jury could infer that the defendant had the requisite intent because one of his codefendants was about to assault Clemente simply is incorrect. The state had not charged the defendant as an accessory, and the court had not been asked to instruct the jury on accessorial liability. See *State* v. *Davis*, 163 Conn. App. 458, 470, 136 A.2d 257 (2016) ("[A] reviewing court may not uphold a conviction premised on accessorial liability if the court foreclosed the jury from basing its guilty verdict on that theory. See *State* v. *Faulkner*, 48 Conn. App. 275, 277, 709 A.2d 36 [1998] [noting in review of sufficiency of evidence to support conviction as accessory that trial court instructed jury as to both principal and accessorial liability]; *State* v. *Channer*, 28 Conn. App. 161, 166, 612 A.2d 95 [noting in review of sufficiency of evidence that reviewing court limited to considering whether evidence supported finding that defendant acted as principal because trial court did not instruct jury as to accessorial liability], cert. denied, 223 Conn. 921, 614 A.2d 826 [1992]." [Internal quotation marks omitted.]). Consequently, without proof beyond a reasonable doubt that it was specifically the defendant who intended to commit felony assault against Clemente, the defendant could not be convicted of attempt to commit home invasion. Finally, contrary to the state's suggestion before this court that the defendant's possession of the knife permitted an inference that he intended to use it to assault Clemente if he gained unlawful entry to unit 69, the state argued to the jury that the defendant's intent to use the knife was formed quickly on the scene when he was fighting with Lopez. Thus, the state did not argue at trial, and the evidence did not establish, that the defendant possessed the required specific intent to commit the crime of attempt to commit home invasion as charged and pursued by the state.

Accordingly, we conclude that the evidence is insufficient to sustain the defendant's conviction of attempt to commit home invasion.

The judgment is reversed only with respect to the defendant's conviction of attempt to commit home invasion in violation of § 53a-100aa (a) (1), and the case is remanded with direction to render a judgment of acquittal on that count and for resentencing in accordance with law; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The defendant also was convicted of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), as a lesser included offense of murder in violation of General Statutes § 53a-54a (a). He does not appeal from the judgment of conviction on that count. We also note that the jury found the defendant not guilty of attempt to commit home invasion in violation of §§ 53a-49 and 53a-100aa (a) (2).

[2] The defendant was described as being larger and heavier than Jones or Pryce, weighing approximately 250 pounds.

[3] The evidence showed that Pryce regularly stayed or lived in unit 31 of the Summerfield apartment complex with his girlfriend, but that the defendant and Jones lived in another area of East Hartford, although Rodriguez had seen Jones around the complex previously. Jones was godfather to the child of Pryce and his girlfriend. Rodriguez testified that she had never seen the defendant before.

[4] Fuentes refused to testify during the trial.

[5] Lopez later died from his injuries.

[6] General Statutes § 53a-100aa (a) provides: "A person is guilty of home invasion when such person enters or remains unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense: (1) Acting either alone or with one or more persons, such person or another participant in the crime commits or attempts to commit a felony against the person of another person other than a participant in the crime who is actually present in such dwelling, or (2) such person is armed with explosives or a deadly weapon or dangerous instrument."

[7] The defendant preserved this issue by moving for a judgment of acquittal at the close of the state's evidence. Furthermore, even if unpreserved, a sufficiency of the evidence claim merits review. See *State* v. *Lewis*, 303 Conn. 760, 767 n.4, 36 A.3d 670 (2012).

[8] Consistent with the state's theory of the case, the court charged the jury, in relevant part, that "[i]n this case, the state claims that the defendant intended to commit the crime of assault in the second degree. To prove assault in the second degree, the state must prove beyond a reasonable doubt that (1) the defendant had the specific intent to cause serious physical injury to another person, Jouleigh Clemente . . . ."

[9] Although the state argues that the jury could have concluded that the defendant brought a knife to use on Clemente inside unit 69, the jury found the defendant not guilty of violating § 53a-100 (a) (2). See footnote 6 of this opinion.

[10] Nieves testified that he told Rodriguez to call the police because he saw the "heavy dude" with his hand in his waistband and thought he might have a gun. We note, however, that there was no evidence that the defendant or anyone else had a gun that night.

[11] Rodriguez testified that the assailants damaged her screen door and the wooden door to her apartment.

[12] In its closing argument, the state argued that the defendant was guilty of a violation of § 53a-100aa (a) (2), as charged, because he was armed with a knife when he attempted to enter unit 69 in an illegal manner, with the intent to commit a felony assault upon Clemente. The state did not argue to the jury, however, that the defendant had intended to use that knife on Clemente. The state also argued to the jury that the defendant first formed the intent to use the knife "quickly on the scene" when he was fighting with Lopez.