******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOVANNE BROWN
(SC 20408)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§§ 53a-133 and 53a-136 (a)), a person commits robbery
in the third degree when, in the course of committing a larceny, he uses
or threatens the immediate use of physical force upon another person
for the purpose of preventing or overcoming resistance to the taking
of the property or to the retention thereof immediately after the taking,
or compelling the owner of such property or another person to deliver
up the property or to engage in other conduct that aids in the commission
of the larceny.

Pursuant further to statute (§ 53a-119), "[a] person commits larceny when,
with intent to deprive another of property or to appropriate the same
to himself or a third person, he wrongfully takes, obtains or withholds
such property from an owner."

Convicted of the crimes of felony murder and carrying a pistol or revolver
without a permit in connection with the shooting death of the victim,
the defendant appealed to this court. After agreeing to assist in a drug
transaction in exchange for a large sum of money, the defendant met
with another individual, H, and got into the back seat of H's car. H told
the defendant that there was a gun on the floor and that the defendant's
role was to "make sure that nothing happened." H then parked on a
street near the victim's parked car. Sometime after their arrival, the
defendant, who never saw any money in H's car, twice asked H if he
had brought any money with him. Thereafter, the victim entered the
front passenger seat of H's car, discussed the details of the transaction,
which involved a substantial amount of marijuana, and returned to his
own car. H then drove around the block a few times before returning
and parking his car a second time. H exited his car to retrieve the
marijuana from the victim's car, after which the victim got into the front
passenger seat of H's car. The defendant, who was sitting behind the
victim at that point, used the gun on the car floor to exchange gunfire
with the victim, who was shot five times. The defendant was shot once.
H then returned to his car with the marijuana, pushed the victim out
of the car, and drove the defendant to a hospital. The next morning,
the police interviewed the defendant at the hospital. The police told the
defendant that they had viewed surveillance footage of the scene of the
shooting, but the defendant denied knowing anything about the shooting
or the victim's death. Later that day, the police interviewed the defendant
a second time at his home. At that point, the defendant admitted that
he had participated in the drug transaction and had shot the victim, but
he claimed that the victim had shot him first, after the defendant made
a noise that startled the victim. When asked if "the intent was to rob"
the victim of the marijuana, the defendant said "I guess so." At trial,
the defendant testified and claimed that he had acted in self-defense,
reiterating that he shot the victim only because the victim, who had
been startled by a noise he made, shot at him first. The defendant further
testified that he did not intentionally kill the victim and that he took
nothing from the victim. Although the defendant had been charged with
murder, among other crimes, the jury found the defendant not guilty of
murder but guilty of the lesser included offense of intentional manslaugh-
ter in the first degree with a firearm, as well as felony murder, with
robbery in the third degree as the predicate felony, and carrying a pistol
or revolver without a permit. The trial court ultimately vacated the
conviction of intentional manslaughter in the first degree with a firearm
on the ground that the defendant could not be convicted of multiple
homicide charges for the same act. On appeal, the defendant claimed
that there was insufficient evidence to support his conviction of felony
murder, that the vacated manslaughter conviction could not be rein-
stated in the event that this court agreed that there was insufficient
evidence to support his felony murder conviction because the state

failed to prove beyond a reasonable doubt that he did not act in self-defense, and that the prosecutor engaged in certain improprieties during closing argument. *Held*:

1. The evidence was sufficient to support the defendant's conviction of felony murder, based on the predicate felony of robbery in the third degree, and, because this court rejected the defendant's insufficiency claim, it declined to address his claim related to the vacated manslaughter conviction:

a. The jury reasonably could have concluded, beyond a reasonable doubt and on the basis of all of the evidence, that the defendant intended to commit a larceny, insofar as he intended to deprive the victim of the marijuana:

The circumstantial evidence was sufficient to support the jury's conclusion that the defendant had the requisite intent to deprive the victim of the marijuana, as the defendant knew at the time of the shooting that H did not have the means to or intend to pay for the marijuana and that the defendant's role was to participate in the robbery by using a gun to make sure "nothing happened," the defendant shot the victim and then left the scene with H and the marijuana, the defendant responded, "I guess so," when asked by the police if the plan had been to rob the victim, and, applying common sense, the jury reasonably could have inferred that the defendant had intended to use the gun to ensure that the victim, upon getting into H's car and discovering that there was no money, would not leave the car to get the marijuana back from H and that there would have been no reason for the victim to shoot the defendant while H was retrieving the marijuana from the victim's car unless the victim believed that H and the defendant had intended to take the marijuana without paying for it.

Because the jury was entitled to discredit the defendant's exculpatory testimony while crediting his testimony that was corroborated by other evidence admitted at trial, the jury reasonably could have rejected the defendant's testimony that he had shot at the victim only after the startled victim shot at him and reasonably could have concluded that the victim had shot the defendant because the defendant was attempting to hold him at bay with the gun, was about to shoot him, or already had shot him to prevent him from interfering with H's taking of the marijuana.

Moreover, in light of the fact that the defendant was aware, after his first interview with the police, that the police had surveillance footage of the scene of the shooting, that the police suspected that the car in that footage was the same car in which the defendant arrived at the hospital, and that the police knew that the defendant had been shot, the jury reasonably could have found that the defendant must have realized, after the initial police interview, that his continued insistence that he had not shot the victim and knew nothing about the incident would simply not be believable, and that the statements the defendant made during his second interview with the police, in which he generally tended to inculpate himself in the victim's murder, were true, and the jury reasonably could have rejected the defendant's claim that he was promised a large sum of money and provided access to a gun to do nothing more than sit in H's car.

b. There was no merit to the defendant's claim that the evidence was insufficient to support the conclusion that he had committed a larceny insofar as there was no evidence that the defendant himself, rather than H, physically took the victim's marijuana, as the jury reasonably have concluded that the defendant wrongfully withheld the marijuana from the victim:

Pursuant to § 53a-119, a person commits larceny when he "takes, obtains or withholds . . . property from [its] owner," the state did not limit its theory of the defendant's commission of larceny to any one of those three statutory terms, the trial court included all three terms in its jury instruction, and, accordingly, the jury could find that the defendant had committed larceny if it found that he obtained or withheld the marijuana, even if he did not physically take it.

Because § 53a-119 did not define the term "withholds," this court considered dictionary definitions of that term, including "[t]o refrain from giving, granting, or permitting," and concluded that there was sufficient

evidence that the defendant had committed larceny in light of the meaning of that term, as the defendant sat behind the victim in H's car and was armed with a gun, the purpose of the defendant's involvement in the drug transaction was to make sure "nothing happened" while H retrieved the marijuana from the victim's car, and the jury reasonably could have inferred that the defendant was in the back seat of H's car with access to the gun for the purpose of "refrain[ing] from giving, granting, or permitting" the victim access to the marijuana.

Moreover, the jury also could have reasonably inferred that the defendant had shot the victim as part of an effort to refrain from permitting or allowing the victim access to the marijuana once H had effectuated the plan to deprive the victim of the marijuana without paying for it.

c. The evidence was sufficient to establish, under §§ 53a-133 and 53a-136a, that the defendant used or threatened the immediate use of force for the purpose of preventing or overcoming the victim's resistance to the taking of the marijuana or compelling the victim to deliver up the marijuana:

The jury reasonably could have found that H would not have gone to retrieve the marijuana from the victim's car unless he and the defendant had come to an understanding that the defendant would prevent the victim from interfering with H's taking of the marijuana and that the victim would have had no apparent reason to shoot the defendant unless the defendant was using or threatening to use force to prevent the victim from interfering with H.

2. The defendant could not prevail on his claim that the prosecutor committed certain improprieties during closing argument by arguing facts that were not in evidence and making inferences that were unsupported by the evidence, in violation of the defendant's due process right to a fair trial:

The prosecutor's remarks that H had brought no money with which to purchase the marijuana and that the victim was startled by the lack of money the second time he entered H's car were supported by the evidence, insofar as the defendant twice asked H whether he had money, never saw any money in H's car, and responded that he "guess[ed]" that it was their intent to rob the victim, and that evidence supported the inference that H did not have any money to pay the victim for the marijuana.

Insofar as the other alleged instances of impropriety related exclusively to the defendant's claim on appeal in connection with his vacated manslaughter conviction, and because that claim was not before this court in light of its conclusion that the evidence was sufficient to support the defendant's felony murder conviction, this court declined to address those prosecutorial impropriety claims.

Argued January 12—officially released December 6, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, and carrying a pistol or revolver without a permit, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Russo, J.*; thereafter, the court granted the defendant's motion for a judgment of acquittal as to the charges of robbery in the first degree and conspiracy to commit robbery in the first degree; subsequently, verdict of guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm, and of felony murder and carrying a pistol or revolver without a permit; thereafter, the court, *Russo, J.*, vacated the conviction as to intentional manslaughter in the first degree with a firearm and rendered judgment of guilty of felony mur-

der and carrying a pistol or revolver without a permit, from which the defendant appealed to this court. *Affirmed.*

*Jennifer B. Smith*, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *C. Robert Satti, Jr.*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Jovanne Brown, was convicted, following a jury trial, of felony murder in violation of General Statutes § 53a-54c, with robbery in the third degree in violation of General Statutes § 53a-136 (a) as the predicate felony; intentional manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a);[1] and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a).[2] The trial court vacated the manslaughter conviction on the ground that the defendant could not be convicted of multiple homicide charges for the same act but otherwise rendered judgment in accordance with the verdict.

On appeal, the defendant claims that the evidence was insufficient to support his conviction of felony murder. Specifically, he contends that there was no evidence that he intended to commit a larceny, that he committed a larceny, or that he used or threatened the immediate use of physical force to effectuate a taking, as required to establish that he committed robbery in the third degree. The defendant also contends that, if this court agrees with his claim of insufficient evidence of felony murder, it cannot reinstate his vacated conviction of the intentional manslaughter in the first degree with a firearm charge because the state failed to prove beyond a reasonable doubt that he did not shoot the victim in self-defense. Finally, the defendant claims that his conviction must be reversed because the prosecutor engaged in prosecutorial improprieties during closing argument. We reject the defendant's insufficiency claim and, therefore, need not address his claim related to the manslaughter conviction. We also reject the defendant's claims of prosecutorial impropriety and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of February 24, 2017, the defendant received a phone call from a person known to him as "Marley," who asked the defendant whether he would be willing to assist in a deal involving the purchase and sale of three pounds of marijuana. Marley offered to pay the defendant $2000 to do so. The defendant agreed to participate in the drug deal so that he could get the money he needed to fix his car's transmission.

Shortly after speaking with Marley, the defendant went to the parking lot of the Duchess restaurant in Bridgeport, where Willard Hargrove, an individual unknown to the defendant, drove up in a white Hyundai Sonata. Hargrove told the defendant to sit in the back seat, so that the person who they were going to meet could sit in the front passenger seat and discuss the drug deal. When the defendant got into the car, Hargrove told him that there was a gun on the floor[3] and that the

defendant's role was to "make sure the deal went right" or to "make sure that nothing happened." He also told the defendant that he should "wipe [the gun] down."

Hargrove drove to Berkshire Avenue in Bridgeport and parked on the street. The victim, Michael Watkins, got out of a car that was parked nearby, approached Hargrove's car, and got into the front passenger seat. The defendant was sitting behind him. After discussing the drug deal with Hargrove, the victim left the car and returned to his own car. Hargrove then left the scene and drove around the block a few times.

Meanwhile, Dave Depass, the person who had provided the victim with the three pounds of marijuana to sell, was watching the transaction from the window of his third floor apartment at the corner of Berkshire Avenue and Orchard Street.[4] When Depass saw Hargrove leave the scene and drive around the block, he suspected that something was amiss and called the victim by cell phone and warned him two or three times not to get back into Hargrove's car when he returned.

After driving around for several minutes, Hargrove parked his car on Berkshire Avenue again, at which point he exited the car and went to the victim's car to get the marijuana. Shortly thereafter, the victim got into the front passenger seat of Hargrove's car. The defendant was still sitting in the back seat. Using the gun that was on the floor of the car, the defendant shot the victim five times in his back. At some point during this shooting, the defendant received a gunshot wound to his right upper chest. The victim died from his wounds.

After shooting the victim, the defendant crawled over him and exited the car through the front driver side door because the childproof safety locks on the back doors of the Hyundai Sonata were activated. At that point, Hargrove returned to the car carrying a bag of marijuana,[5] and the defendant told him that he had been shot. Hargrove got into the driver's seat, put the bag in the back seat and pushed the victim out of the car. The defendant then stepped over the victim and got into the front passenger seat. Hargrove drove the defendant to St. Vincent's Medical Center, a hospital in Bridgeport, helped him inside and immediately drove away.

The gun that the defendant used to shoot the victim, a .32 caliber Smith & Wesson revolver, was later found in an abandoned car in Bridgeport. When the police searched the crime scene after the removal of the victim's body, the only items of evidence they found were a blood-like substance on the ground and the victim's cell phone. During a subsequent investigation, the police were able to determine that Hargrove possessed a white Hyundai Sonata, but they never found the car.

At about 12:50 a.m. on the morning after the shooting, February 25, 2017, Christopher Lamaine, a lieutenant

with the Bridgeport Police Department, went to St. Vincent's Medical Center to interview the defendant. Brian Fitzgerald, a captain with the police department, and Vincent Larrichia, a detective, were there when Lamaine arrived. Before interviewing the defendant, Lamaine viewed a surveillance video recording taken from a house on Brooks Street, adjacent to the scene of the shooting. The video recording, which was of poor quality and repeatedly skipped, showed a white car turning onto Berkshire Avenue and parking at approximately 9:34 p.m. on February 24, 2017. Several minutes later, an individual exited the driver's door and walked in the direction of the victim's car. A few seconds after that, the victim approached the back of the white car and attempted unsuccessfully to open the back door on the passenger side.

After that unsuccessful attempt to enter the rear of the car, the victim, at approximately 9:38 p.m., opened the door to the front passenger seat and got in. Shortly thereafter, the driver's door opened, and an individual, later identified as the defendant, got out. The video then skipped several seconds, after which the defendant could be seen following the car as it moved slowly down the street.[6] As the defendant approached the front driver side door, the car stopped, and the door opened. The defendant then ran around the front of the car. At that point, the front passenger side door was opened from the inside, and a body emerged from the door and fell to the ground. The defendant stepped over the body, which appeared to be moving, and got into the front passenger seat. The car then left the scene.

During the interview with Lamaine, the defendant stated that, earlier in the evening, he had left his home on Glenwood Avenue in Bridgeport, on the city's east side, to walk several miles to the west side of the city to buy $10 worth of marijuana from an acquaintance. While he was walking, a car pulled up beside him, and a passenger in the car shot him. After he was shot, a white car pulled up beside him, and an individual whom he did not know asked him if he was alright. The defendant said that he was not and got into the car, at which point the individual drove him to the hospital. Lamaine, who suspected that the white car in which the defendant had been driven to the hospital[7] was the same white car that was shown on the surveillance video of the crime scene, told the defendant that he had viewed the surveillance video.

Lamaine also told the defendant that the victim was dead and asked the defendant if he knew what happened to the victim. The defendant denied knowing anything about the victim's death. Lamaine also asked the defendant whether, if the police found the white car in which the defendant had arrived at the hospital, they would find his blood in the back seat. The defendant stated that he had initially gotten into the back

seat of the car that picked him up and then climbed into the front seat.

In the afternoon of February 25, 2017, Fitzgerald and Larrichia went to the defendant's home on Glenwood Avenue in Bridgeport to interview him again. At that interview, the defendant's parents, his sister and a cousin who identified himself as a correction officer were present. The defendant admitted, at that point, that he had shot the victim with a revolver. The defendant also told Fitzgerald and Larrichia that the victim shot him after he made a noise that startled the victim. The defendant stated that he had agreed to be paid $2000 to "make sure that nothing happened" during the drug deal because he wanted the money to fix his car. When Fitzgerald asked the defendant if "the intent was to rob" the victim of the marijuana, the defendant said, "I guess so."

Shortly after the interview, the police arrested the defendant. The police subsequently charged the defendant with murder, felony murder with the predicate felony of robbery in the third degree, robbery in the first degree, conspiracy to commit robbery in the first degree, and carrying a pistol or revolver without a permit. After the prosecutor presented the prosecution's case at trial, defense counsel moved for a judgment of acquittal on the charges of robbery in the first degree and conspiracy to commit robbery in the first degree. The trial court granted the motion. The court stated in its ruling that "the elements of robbery in the third degree [which is a lesser included offense of robbery in the first degree] are: a person is guilty of robbery in the third degree when he, in the course of committing a larceny, uses or threatens the immediate use of physical force [on] another person for the purpose of either preventing or overcoming resistance to the taking of the property, or compelling the owner of such property or another person to deliver up the property. Here, the court simply is constrained to find any evidence in the record . . . that would support a finding, at this juncture, that there was a prevention or overcoming resistance to the taking of . . . the marijuana out of the car or that [the victim] was compelled to deliver up the property."

With respect to the charge of conspiracy to commit robbery in the first degree, the trial court concluded that, considered in context, the evidence that the defendant had said "I guess so" when asked whether "the intent was to rob" and that Hargrove had told the defendant to wipe down the gun was not sufficient to support the charge. Thus, the jury was left to determine the defendant's guilt with respect to the remaining charges, namely, murder, felony murder with the predicate felony of robbery in the third degree, and carrying a pistol or revolver without a permit.[8]

Thereafter, the defendant testified in his own defense.

He testified that, when he got into a white Hyundai at the Duchess restaurant on the evening of February 24, 2017, he had never seen Hargrove before. The defendant did not know where Hargrove was going when they left the restaurant. He explained that, when they arrived at Berkshire Avenue and parked, the victim got into Hargrove's car. The victim then told Hargrove that he should go to the victim's car to get the marijuana while the victim retrieved the money from Hargrove's car. The defendant did not know the victim.

The defendant further testified that, when the victim got into Hargrove's car the second time, after Hargrove and the defendant had returned from driving around the block, the victim was startled by the rustling of the defendant's "puffer jacket" and turned toward the defendant. The defendant then tried "to grab for whatever [the victim was] reaching for," but, before he could do so, the victim shot him. When the defendant tried to leave the car, the victim would not let him and said that he was going to kill him. The defendant then grabbed the gun that was on the floor of the car and shot the victim. The defendant had never seen the gun before he got into the car. The defendant testified that he did not intentionally kill the victim and that he took nothing from the victim.

On cross-examination, the defendant testified that he had no money when he got into Hargrove's car and never saw any money in the car, but he did not know that there was no money in the car. Hargrove told the defendant to sit in the back seat of the car when he got into the car at the Duchess restaurant, but the defendant was not "hiding" there. The defendant asked Hargrove twice, after "he pulled up," whether he had any money. When the victim got into Hargrove's car the second time and pulled out his gun, the defendant grabbed the gun with his left hand and wrestled with the victim, even though the defendant, who was five feet, six inches tall and weighed approximately 120 pounds at the time of the shooting, was much smaller than the victim, who was a "big" man, more than six feet tall.

The defendant further testified that, when Hargrove returned to his car after the defendant shot the victim, the defendant asked Hargrove if he could call an ambulance for the victim, but Hargrove said that the victim was already "gone . . . ." The defendant admitted that he never told the police, after the shooting, that he had asked Hargrove to call an ambulance. With respect to the police interview at the hospital, the defendant acknowledged that the police told him that, when they found the white car that was at the scene of the shooting, they would do a DNA analysis of any blood that they found inside the car. The defendant denied that "the plan . . . all along . . . was to rob [the victim] of his property . . . ."

After the conclusion of evidence, the trial court

instructed the jury that the defendant was claiming self-defense with respect to the murder charge and the lesser included offenses of that charge, and on the elements of that claim. The court further instructed the jury that, if the jury found that the state had established the elements of murder or the lesser included offenses of manslaughter, it must find that the state had disproved one of the elements of self-defense beyond a reasonable doubt before it could find the defendant guilty.

The jury found the defendant not guilty of murder but guilty of intentional manslaughter in the first degree with a firearm, felony murder, and carrying a pistol or revolver without a permit. The jury found, in special interrogatories, that the defendant had used a firearm to commit intentional manslaughter in the first degree with a firearm and felony murder.

At sentencing, the trial court vacated the conviction of intentional manslaughter in the first degree with a firearm on the ground that the defendant could not be convicted of multiple homicide charges for the same act. See, e.g., *State* v. *John*, 210 Conn. 652, 695–97, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), and cert. denied sub nom. *Seebeck* v. *Connecticut*, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). The trial court sentenced the defendant to an effective sentence of forty-two years of imprisonment, execution suspended after forty years, and five years of probation on the remaining convictions.

This direct appeal followed. The defendant claims that (1) there was insufficient evidence to support the conviction of felony murder with the predicate felony of robbery in the third degree because there was no evidence that the defendant intended to or did commit a larceny or that he used or threatened the immediate use of physical force to effectuate the taking of the marijuana, and (2) the prosecutor engaged in improprieties during closing argument that deprived the defendant of his right to a fair trial. We reject both claims.

I

We first address the defendant's claim that there was insufficient evidence to support his conviction of felony murder.[9] We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven

beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Ordinarily, intent can only be inferred by circumstantial evidence; it may be and usually is inferred from the defendant's conduct. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 503–505, 180 A.3d 882 (2018).

"[A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 519, 782 A.2d 658 (2001).

To establish the elements of felony murder in the present case, the state was required to establish that, acting either alone or with one or more persons, the defendant committed or attempted to commit robbery in the third degree and, in the course of and in further-

ance of such crime, the defendant caused the death of a person other than one of the participants. General Statutes § 53a-54c. Thus, to secure a conviction of felony murder, the state was required to prove, beyond a reasonable doubt, all of the elements of robbery in the third degree. See, e.g., *State* v. *Lewis*, 245 Conn. 779, 786, 717 A.2d 1140 (1998).

Section 53a-136 (a) defines robbery in the third degree as "robbery as defined in section 53a-133." General Statutes § 53a-133, in turn, provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property *or* to appropriate the same to himself or a third person, he wrongfully takes, obtains *or* withholds such property from an owner. . . ." (Emphasis added.) "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." General Statutes § 53a-3 (11). "[I]ntent [can] be formed instantaneously and [does] not require any specific period of time for thought or premeditation for its formation." (Internal quotation marks omitted.) *State* v. *Carter*, 317 Conn. 845, 857, 120 A.3d 1229 (2015).

A

The defendant first claims that the state failed to establish that he intended to commit a larceny because there was no evidence that he had any intent to deprive the victim of the marijuana or to appropriate it to himself or to Hargrove. See General Statutes § 53a-119. Rather, the defendant contends, the evidence compels the conclusion that his only intent was "to sit in [Hargrove's] car while the victim and Hargrove conducted the sale." The state responds that the "evidence showed that the defendant had a dishonest purpose or intention to deprive the victim of his marijuana by assisting Hargrove to wrongfully exercise control over it."

For the reasons that follow, we agree with the state that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant had the requisite intent to deprive the victim of his marijuana. As a result, we need not address whether there was sufficient evidence for the jury to find that the defendant also had the intent to appropriate the marijuana to himself or a third person. See General Statutes § 53a-

119.

The evidence showed that (1) Hargrove told the defendant that his role was to "make sure that nothing happened," that there was a gun on the floor in the back seat of Hargrove's car, and that he should "wipe [the gun] down," (2) the defendant never saw any money in Hargrove's car, and, at some point after arriving at Berkshire Avenue, he asked Hargrove twice whether he had any money, (3) the victim told Hargrove, when he got into Hargrove's car the first time, that Hargrove should get the marijuana from the victim's car while the victim got the money from Hargrove's car, (4) Hargrove did not immediately complete the drug transaction after meeting with the victim but, instead, left the scene and drove around the block a few times, (5) Depass, who had arranged the drug transaction, warned the victim not to get back into Hargrove's car when Hargrove returned from driving around the block because Depass was concerned that something was amiss, (6) after the victim entered Hargrove's car the second time, the defendant killed the victim by shooting him five times in the back, (7) Hargrove and the defendant left the scene with the bag of marijuana and the victim dead or dying in the street, and (8) when asked by the police on the day after the shooting whether the intent was to rob the victim, the defendant responded, "I guess so."

Applying the proper standard of review to the evidence in the present case, we conclude that, although there was no direct evidence that the defendant and Hargrove intended to rob the victim, the circumstantial evidence was sufficient to support the jury's conclusion that the defendant intended to deprive the victim of his marijuana. Specifically, the jury reasonably could have inferred that the defendant knew, at least from the time that Hargrove parked on Berkshire Avenue for the second time, that Hargrove did not intend to pay for the marijuana and that the defendant's role was to participate in the robbery by using the gun to "make sure that nothing happened." The defendant then used that gun to shoot the victim five times in the back. Afterward, the defendant and Hargrove left with the marijuana. Indeed, the defendant himself responded, "I guess so," when asked by the police if the plan had been to rob the victim.[10]

On the basis of the foregoing evidence, the jury, applying common sense, could have inferred that the defendant had intended to use the gun to ensure that the victim, upon getting into Hargrove's car and discovering that there was no money, would not leave the car to get his marijuana back, and that the defendant had intentionally used or threatened to use the gun to prevent the victim from interfering with the plan to deprive the victim of the marijuana. The jury also reasonably could have concluded that there would have been no

reason for the victim to shoot the defendant while Hargrove was retrieving the drugs from the victim's car unless the victim believed that Hargrove and the defendant intended to deprive him of his marijuana without paying for it. Based on all of the foregoing, and construing the evidence in a light most favorable to sustaining the verdict, we conclude that the jury reasonably could have inferred from this evidence that the defendant had the intent to deprive the victim of the marijuana.

Finally, we note that the jury reasonably could have rejected altogether the defendant's testimony that the victim had been "startled" by a noise and, instead, concluded that the victim had shot the defendant because the defendant was attempting to hold him at bay with the gun, was about to shoot him, or already had shot him to prevent him from interfering with Hargrove. Indeed, the jury was entitled to discredit the defendant's exculpatory testimony while crediting his testimony that was corroborated by other evidence; see, e.g., *Barrila* v. *Blake*, 190 Conn. 631, 639, 461 A.2d 1375 (1983) ("[a] trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible" (citations omitted)); and it would have been reasonable for it to do so. The evidence showed that the defendant knew, after his first interview with the police at the hospital, that the police had a video recording of the scene of the shooting. The defendant also knew that the police suspected that the car shown in that video recording was the same car in which the defendant arrived at the hospital, and they knew that the defendant had been shot. Moreover, the defendant knew that, if the police found Hargrove's car, they would find the defendant's blood in the back seat and the victim's blood in the front seat.

Accordingly, the jury reasonably could have concluded that the defendant must have realized after the initial police interview—during which he gave false information to the police—that his continued insistence that he had not shot the victim and knew nothing about the incident would simply not be believable. There were several hours between that interview and the second interview at the defendant's home during which the defendant, by himself or in consultation with others, had the opportunity to come up with a version of events in which he would admit that he agreed to participate in the drug deal and that he shot the victim—for which the police already had compelling evidence—but would claim that he knew nothing about any plan to rob the victim and that the shooting was in self-defense. Thus, the jury reasonably could have concluded that the statements that the defendant made during his second interview with the police that were consistent with the other evidence that the police had—which generally tended to inculpate the defendant—were true, whereas the statements that tended to exculpate him were not.

The defendant correctly points out that "the jury was not free to infer the opposite of what the defendant asserted in his statements based solely on its disbelief of those assertions." *State* v. *Copas*, 252 Conn. 318, 343 n.31, 746 A.2d 761 (2000). As we previously explained, however, there was affirmative evidence and reasonable inferences the jury could have drawn therefrom that would support the conclusion that the defendant did not intend simply to observe a drug deal between Hargrove and the victim and that he intentionally used or threatened the immediate use of physical force to prevent the victim from interfering with Hargrove's taking of the victim's marijuana.

The defendant also relies on this court's decision in *State* v. *Stovall*, 316 Conn. 514, 115 A.3d 1071 (2015). In *Stovall*, the defendant contended that there was insufficient evidence to support his conviction of possession of narcotics with intent to sell within 1500 feet of a housing project when "the state failed to introduce any evidence to prove beyond a reasonable doubt that he intended to sell narcotics at a particular location in or within 1500 feet of [the housing project at issue]." Id., 522. In support of its claim to the contrary, the state relied on "testimony that the defendant regularly visited [an] apartment in [the housing project] two or three times per week, that [the housing project was] known for drug trafficking, that the defendant made a business arrangement with [an acquaintance] to store items in the hallway closet in her apartment in [the housing project], and that narcotics packaged for sale and other materials suggesting the packaging and sale of narcotics were recovered from the hallway closet during the search of [the] apartment." Id., 522–23.

This court concluded that, although the "evidence provided ample support for the inference that the defendant intended to store and package narcotics in [the acquaintance's] apartment for sale, it did not have any probative value with respect to the intended location of the sales, that is, whether the defendant intended to sell the narcotics in [the] apartment or in another location within 1500 feet of [the housing project]." Id., 523–24. "The evidence was equally supportive of an inference that the defendant intended to sell the drugs outside of the prohibited zone or anywhere that the opportunity presented itself. This court has concluded that [when] the evidence is in equipoise or equal, the [s]tate has not sustained its burden [of proof] . . . . *State* v. *Moss*, 189 Conn. 364, 369, 456 A.2d 274 (1983); see also *United States* v. *Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt . . .)." (Internal quotation marks omitted.) *State* v. *Stovall*, supra, 316 Conn. 527.

In the present case, the defendant contends that, under *Stovall*, the evidence was insufficient to establish that he intended to commit larceny because, at best, it would equally support a finding that he participated in the drug deal simply to "make sure that nothing happened" and that he shot the victim in self-defense or a finding that he intended to steal the victim's marijuana and that he used or threatened to use physical force to prevent the victim from interfering with Hargrove. We disagree. For the reasons that we already stated, viewing the evidence in a light most favorable to sustaining the verdict, we conclude that the jury reasonably could have concluded beyond a reasonable doubt, on the basis of all of the evidence, that the victim and the defendant exchanged gunfire because the defendant was using or threatening to use force against the victim to carry out his intent to deprive the victim of his marijuana. The jury also reasonably could have rejected the defendant's claims that he was promised $2000 and given a gun to do nothing more than sit in the car and that he shot the victim during the course of a drug sale only because the victim shot at the defendant after the defendant startled him. Accordingly, we reject this claim.

B

The defendant also claims that there was insufficient evidence to support the conclusion that he committed a larceny because there was no evidence that he himself took the victim's marijuana. Rather, he claims that the evidence compels the conclusion that, if there was a larceny, it was Hargrove who took the marijuana. The defendant further contends that he cannot be found guilty as an accessory because the jury was not instructed on accessorial liability. See, e.g., *State* v. *Williams*, 187 Conn. App. 333, 348–49, 202 A.3d 470 (2019); *State* v. *Holley*, 160 Conn. App. 578, 592, 127 A.3d 221 (2015) (overruled on other grounds by *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022)), rev'd on other grounds, 327 Conn. 576, 175 A.3d 514 (2018).

As we explained, § 53a-119 provides in relevant part that "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." Having concluded that there was sufficient evidence to support a finding that the defendant had the intent to deprive the victim of his marijuana; see part I A of this opinion; we must determine whether there was sufficient evidence to demonstrate that the defendant wrongfully took, obtained or withheld the marijuana from the victim.[11]

At the outset, we note that § 53a-119 provides three distinct terms that can be used to establish what action the defendant must engage in to satisfy that element

of larceny: "takes, obtains or withholds . . . property from an owner." General Statutes § 53a-119. In interpreting the meaning of these terms, we are mindful of the "basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010).

The defendant asserts that the jury could not reasonably have found that he committed larceny because he did not physically take the marijuana and the jury was not instructed on accessorial liability. Therefore, the defendant asserts, there is not sufficient evidence to support the jury's finding regarding the commission of the predicate felony of robbery in the third degree under the instruction as given. We disagree.

In the present case, although the state argued that Hargrove physically took the marijuana, the state did not limit its theory of the defendant's guilt of larceny to any one of the three statutory terms—takes, obtains or withholds.[12] Consistent therewith, the jury was not limited to concluding that it could find the defendant guilty of larceny only if it found that he physically took the marijuana, as opposed to either obtaining or withholding the marijuana. Indeed, the jury was instructed: "To prove that the defendant was committing or attempting to commit a larceny, the state must prove beyond a reasonable doubt that [1] the defendant wrongfully took property, or obtained property, or withheld property from an owner, and [2] that, at the time, he intended to deprive the owner of the property or to appropriate such property to himself or a third person." Therefore, in the present case, in determining whether there was sufficient evidence to support the jury's finding regarding the defendant's commission of the predicate felony of robbery in the third degree, we must consider whether there was sufficient evidence of any of these three distinct ways of committing larceny.

We conclude that there was sufficient evidence that the defendant committed larceny under the term "withholds." The term "withholds" is not defined for purposes of § 53a-119. "In the absence of a definition of terms in the statute itself, [w]e may presume . . . that the legislature intended [a word] to have its ordinary meaning in the English language, as gleaned from the context of its use. . . . Under such circumstances, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Meriden* v. *Freedom of Infor-*

*mation Commission*, 338 Conn. 310, 322, 258 A.3d 1 (2021); see also General Statutes § 1-1 (a). Webster's Third New International Dictionary defines "withhold" as "to hold back," "keep from action," "check" or "restrain . . . ." Webster's Third New International Dictionary (2002) p. 2627. The American Heritage College Dictionary defines "withhold" as "[t]o refrain from giving, granting, or permitting." American Heritage College Dictionary (4th Ed. 2007) p. 1574.

In the present case, the evidence established that the defendant "was offered some money to go make sure nothing happened during [the drug] deal." The defendant testified that he was promised $2000. The defendant also testified that, when he got into Hargrove's car the first time, he was told that there was a gun in the back seat and that he should "wipe it down . . . ." The defendant further testified that he had been told that Hargrove was going to go to the victim's car to get the marijuana and that the victim expected to get the money from Hargrove's car, in which the defendant was sitting. The evidence further established that the defendant was never instructed to pay the victim for the marijuana; nor did the defendant have any reason to believe that Hargrove intended to pay the victim. Indeed, the defendant had no money of his own and never saw any money in the car, and Hargrove never affirmed that he had money to pay the victim.

Therefore, the evidence established that the defendant sat in the back seat of Hargrove's car, behind the victim, who sat in the front passenger seat, that the defendant was armed with a gun, and that the purpose of the defendant's being in on the deal was to "make sure nothing happened" while Hargrove got the marijuana from the victim's car. On the basis of the foregoing evidence, the jury reasonably could have inferred that the defendant was in the back seat of Hargrove's car with the gun for the purpose of "refrain[ing] from giving, granting, or permitting" access to the marijuana. American Heritage College Dictionary, supra, p. 1574. The jury reasonably could have also inferred that the defendant shot the victim as part of his effort to refrain from permitting or allowing the victim access to the marijuana once his cohort had effectuated their plan to deprive the victim of the marijuana without paying for it. On the basis of the evidence and the reasonable inferences drawn therefrom, we conclude that there was sufficient evidence for the jury to have found that the defendant committed larceny.

C

The defendant finally claims that the evidence was insufficient to establish that he used or threatened the immediate use of physical force "for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such

property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133 (defining "robbery").[13] In support of this claim, the defendant relies on this court's holding in *State* v. *Coston*, 182 Conn. 430, 435, 438 A.2d 701 (1980), that "[t]he fact that the defendant committed a larceny while carrying a concealed weapon and later assaulted the victims of the larceny in an attempt to escape does not by itself permit [this court] to sustain his conviction for attempted robbery" because there was no evidence that the defendant used the weapon with the purpose of preventing resistance to the taking or compelling the owner to deliver up the property. We disagree.

We concluded in part I A of this opinion that the jury reasonably could have found that Hargrove would not have gone to retrieve the marijuana from the victim's car unless he and the defendant had come to an understanding that the defendant would prevent the victim from interfering with Hargrove. We also concluded that the victim would have had no apparent reason to shoot the defendant unless the defendant was using or threatening to use force to prevent the victim from interfering with Hargrove. Thus, the evidence was sufficient to establish that the defendant used or threatened the immediate use of physical force for the purpose of overcoming the victim's resistance to the taking of the marijuana or to the retention thereof immediately after the taking.[14]

## II

The defendant next claims that he was deprived of his due process right to a fair trial when the prosecutor engaged in prosecutorial improprieties during closing argument by arguing facts that were not in evidence and making inferences that were unsupported by the evidence. We are not persuaded.

The defendant contends that the prosecutor improperly relied on facts that were not in evidence or made unsupported inferences on four occasions. First, the defendant claims that, during the prosecutor's main closing argument to the jury, the prosecutor improperly argued that "[t]he defendant has agreed that there was a drug deal that was going to go down, that *they showed up with no money*." (Emphasis added.) Second, he claims that the prosecutor improperly argued that the defendant did not know that he was shot, thereby suggesting that he was not acting in self-defense when he shot the victim. Third, he argues that, during rebuttal argument, the prosecutor improperly argued that the victim was startled when he got into Hargrove's car the second time because there was no money in the car.[15] Fourth, he claims that the prosecutor improperly stated, during rebuttal argument, that Depass "assume[d] that [the victim] had a gun because he had it in the past," when Depass testified, instead, that the victim told him that

he had a gun.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [improper conduct] occurred in the first instance; and (2) whether that [improper conduct] deprived a defendant of his due process right to a fair trial. Put differently, [improper conduct] is [improper conduct], regardless of its ultimate effect on the fairness of the trial; whether that [improper conduct] caused or contributed to a due process violation is a separate and distinct question . . . . As we have indicated, our determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [improper conduct] was objected to at trial." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006). "These factors include the extent to which the [improper conduct] was invited by defense conduct or argument, the severity of the [improper conduct], the frequency of the [improper conduct], the centrality of the [improper conduct] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." Id., 361.

"As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Martinez*, 319 Conn. 712, 727, 127 A.3d 164 (2015).

We first address the defendant's claim that the prosecutor's argument that Hargrove had no money with him was improper because it was supported by no evidence. We already concluded that the evidence that the defendant asked Hargrove twice whether he had money, that the defendant never saw any money in Hargrove's car, and that the defendant responded "I guess so" to Fitzgerald's inquiry whether "the intent was to rob" the victim supports the inference that Hargrove did not have any money to pay the victim for the marijuana. See part I A of this opinion. Accordingly, we reject this

claim. For the same reason, we reject the defendant's claim that the prosecutor improperly argued that the victim was startled when he entered Hargrove's car the second time because he saw that there was no money.

With respect to the defendant's claim that the prosecutor improperly argued that the defendant did not know that he had been shot when he shot the victim, this claim appears to relate exclusively to the defendant's claim, with respect to his intentional manslaughter in the first degree with a firearm charge, that the state failed to prove beyond a reasonable doubt that he was not acting in self-defense, which we need not address because we rejected his insufficiency claims. See part I of this opinion. In turn, because the self-defense claim is not before us, we need not address this claim of prosecutorial impropriety. We reach a similar conclusion with respect to the defendant's claim that the prosecutor improperly argued that Depass testified that he had "assume[d] that [the victim] had a gun because he had it in the past," when, in fact, Depass testified that the victim told him that he had a gun. Because the defendant contends that the claim relates solely to his claim of self-defense, we need not address it.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] We note that the parties indicated in their original briefs that the defendant had been convicted of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1). We further note that, when the jury returned its verdict, the court clerk asked only whether it had found the defendant guilty of manslaughter in the first degree in violation of § 53a-55 (a) (1). The judgment file also indicated that the defendant had been convicted of manslaughter in the first degree, but it referred to § 53a-55a. At sentencing, the prosecutor clarified that the defendant had been convicted of manslaughter in the first degree with a firearm in violation of § 53a-55a, and defense counsel agreed. Notwithstanding the confusion in the parties' representations and the record, given this clarification at sentencing, it is clear that the defendant was convicted of manslaughter in the first degree with a firearm in violation of § 53a-55a (a).

[2] Initially, the state had also charged the defendant with, inter alia, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2) and conspiracy to commit robbery in the first degree in violation of General Statutes § 53a-48 and § 53a-134 (a) (2). After the prosecutor rested the state's case-in-chief, the trial court granted defense counsel's motion for a judgment of acquittal on those charges.

[3] Some of the evidence presented at trial suggested that Marley may have told the defendant about the gun. Although the defendant testified that Hargrove had told him that there was a gun on the floor in the back seat, Brian Fitzgerald, a captain with the Bridgeport Police Department, testified that, when he interviewed the defendant on the day after the shooting, the defendant had told him that "[h]e was supposed to pick up the gun that was [going to] be inside a car that he was picked up in . . . ." Fitzgerald also testified that the defendant had indicated that, "when he was picked up in [Hargrove's white Hyundai Sonata] . . . there would be a gun in the car." Thus, Fitzgerald's testimony arguably suggests that the defendant indicated that Marley had told him, before Hargrove picked the defendant up at the Duchess restaurant, that there would be a gun in the car.

[4] Earlier in the evening, Depass explained to the victim that he had made a deal to sell the marijuana for $9600. Depass had also given the victim a bag containing the marijuana and watched him place it in his car. At some point in the evening, the victim told Depass that he was carrying a gun.

[5] Depass testified that he saw Hargrove enter the victim's car and remove the container of marijuana.

[6] The quality of the video recording was not sufficient to allow the identification of facial features. Other evidence, including the defendant's own testimony that he had shot the victim, established, however, that the defendant was the person who got out of the car and then followed the car as

it moved down the street.

[7] Surveillance video taken at the entrance to the hospital showed a white car pulling up to the entrance and two men exiting from the car. The video also showed Hargrove and another person, later identified as a bystander, supporting the defendant as he entered the hospital. Depass testified that, after the victim was shot, he went to the Bridgeport police station, where he viewed the surveillance video. He recognized one of the persons who was supporting the defendant as the person he saw removing the marijuana from the car on Berkshire Avenue.

[8] At oral argument before this court, counsel for the defendant suggested that the trial court may have violated the defendant's double jeopardy rights when it submitted the felony murder charge to the jury after it had ruled that there was insufficient evidence to support the predicate felony of robbery in the third degree. There was also some discussion at oral argument about the possibility that the guilty verdict on the felony murder charge was legally inconsistent with the trial court's ruling. Because the defendant did not raise either of these claims in his brief, we do not address them. See, e.g., *J.E. Robert Co.* v. *Signature Properties, LLC*, 309 Conn. 307, 328 n.20, 71 A.3d 492 (2013) ("it is well settled that arguments cannot be raised for the first time at oral argument").

[9] Although this claim was not raised at trial, "it is entitled to review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) [as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)], because any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding.*" (Footnote omitted; internal quotation marks omitted.) *State* v. *Rodriguez-Roman*, 297 Conn. 66, 73, 3 A.3d 783 (2010).

[10] The defendant testified that he asked Hargrove twice, between the time that they first arrived on Berkshire Avenue and the time that they parked there a second time, whether he had any money, and that he never saw any money in Hargrove's car. The jury reasonably could have concluded that, if there was no money visible in Hargrove's car when Hargrove parked a second time on Berkshire Avenue, there was no money. Indeed, it would have made little sense for Hargrove to conceal the money in the car or to carry it with him to the victim's car if he intended to pay the victim for the marijuana. Thus, the evidence supports the inference that the defendant knew, before Hargrove left the car, that there was no money, that the plan all along had been to rob the victim, and that the defendant's role was to participate in the robbery. It is well established that "intent [can] be formed instantaneously and [does] not require any specific period of time for thought or premeditation for its formation." (Internal quotation marks omitted.) *State* v. *Carter*, supra, 317 Conn. 857.

At the very least, the defendant's testimony that he never saw any money in Hargrove's car supports the inference that the victim did not see any money when he got into the car, as there is no apparent reason why the money would have been visible to the victim but not to the defendant. In turn, this supports an inference that Hargrove had no intention of paying for the marijuana. Finally, although the defendant's response of "I guess so" to Fitzgerald's inquiry whether "the intent was to rob" the victim does not necessarily suggest that that was the defendant's intent from the outset, it does support the reasonable inference that the defendant knew, at some point during the events leading up to the shooting, that Hargrove intended to rob the victim, and, therefore, that the defendant's role was to facilitate the robbery. See, e.g., *State* v. *Green*, 261 Conn. 653, 668, 804 A.2d 810 (2002) ("the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence" (internal quotation marks omitted)).

[11] After oral argument before this court, we requested supplemental briefs on the following issues: (1) "Given that the jury was instructed on all the statutory elements of felony murder, and the predicate felony of robbery in the third degree, analyze whether the defendant's claim that the evidence was insufficient to support his conviction on the predicate felony of robbery in the third degree is more properly framed as a claim that the trial court improperly failed to instruct the jury on the statutory definitions of 'appropriate,' set forth in General Statutes § 53a-118 (a) (4) (A), and 'obtain,' set forth in § 53a-118 (a) (2). See *State* v. *Russell*, 101 Conn. App. 298, 327 and n.30, 922 A.2d 191 [cert. denied, 284 Conn. 910, 931 A.2d 934] (2007)." And (2) "[i]f the defendant's claim is more properly characterized as a claim of instructional error, was the trial court's failure to instruct the jury on the definitions set forth in § 53a-118 (a) (2) and (4) (A) error and, if so, was the error harmful? See *State* v. *Spillane*, 255 Conn. 746, 757–58, 770 A.2d

898 (2001)."

After reviewing the supplemental briefs, we conclude that it would not be appropriate to construe the defendant's sufficiency claim as an unpreserved claim of instructional error. Although we acknowledge that it may have been preferable for the jury to be instructed on the statutory definitions of these terms; see, e.g., id., 755; neither party requested that the jury be charged on the statutory definitions or objected to the instructions on that basis. Moreover, because we find that there was sufficient evidence for the jury to find that the defendant committed larceny under the term "withholds," which is not statutorily defined, we need not address this issue. We thus address the defendant's sufficiency claim as it was raised on the merits. Nevertheless, we do caution trial judges to ensure that jury instructions include statutory definitions of the terms used in statutes defining criminal offenses.

[12] On appeal to this court, the state also does not limit its theory of the defendant's guilt to any one of these terms but asserts that the evidence was sufficient to support the defendant's conviction under any of these three terms. Because we conclude that there was sufficient evidence for the jury to find that the defendant committed larceny under "withholds," we need not address the other means of committing larceny under § 53a-119.

[13] In support of this claim, the defendant points out that the trial court granted defense counsel's motion for a judgment of acquittal on the charge of robbery in the first degree because the court concluded that the state had failed to prove that "there was a prevention or overcoming resistance to the taking of . . . the marijuana out of the car or that [the victim] was compelled to deliver up the property," and, therefore, the state failed to establish that the defendant committed robbery in the third degree. As we already explained, the defendant has raised no claim that the trial court violated his double jeopardy rights by submitting the felony murder charge, with the predicate felony of robbery in the third degree, to the jury, or that his conviction on the felony murder charge is invalid because it was inconsistent with the trial court's judgment of acquittal on the charge of robbery in the first degree. See footnote 8 of this opinion. We conclude, therefore, that we may consider all of the evidence presented at trial that the jury considered in determining whether the evidence was sufficient to establish that the defendant used or threatened to use physical force for the purposes set forth in § 53a-133.

[14] Because we conclude that the evidence was sufficient to establish that the defendant committed robbery, we need not address the defendant's claim that the evidence was insufficient to establish that he *attempted* to commit robbery.

[15] Specifically, the prosecutor argued that, on the night of the shooting, "the defendant was there as muscle. And, as part of the role of muscle, is it reasonable to believe that a conversation occurred that wasn't testified to by the [defendant]? [The defendant's] story is, and I'd suggest that he wasn't [going to] change that, that [the victim] gets in the car, and he's startled. Remember, [the judge] talked about you can believe some, all or none of what's said; you can believe that [the victim] was startled. Was it reasonable to believe that he was startled when he found out that there was [$9600] worth of drugs in that car behind him, he was told not to get in the car, and, when he gets in there, he finds out there's no money? There's no money. That would startle him."

_____